FILED
IN OPEN COURT
FEB 12 2015
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 1:14-CR-373 |
| | ) | |
| TYLER EUGENE HARBER, | ) | |
| | ) | |
| Defendant. | ) | |

## STATEMENT OF FACTS

Were this matter to go to trial, the United States of America would prove the following facts beyond a reasonable doubt:

1. At all relevant times, Tyler Eugene Harber ("Harber") was a resident of Alexandria, Virginia.

2. At all relevant times, The Federal Election Campaign Act of 1971, as amended, Title 2, United States Code, Sections 431, et seq., ("Election Act") limited corruption and the appearance of corruption in the election of candidates for federal office, including the office of Member of the United States House of Representatives, and provided for public disclosure of the financing of federal election campaigns:

   a. The Election Act limited the amount and sources of money that may be contributed to a federal candidate or a federal candidate's authorized campaign committee.

   b. Under the Election Act, expenditures by a person or organization in cooperation, consultation, or concert, with, or at the request or suggestion of, the agents of a federal candidate or that candidate's authorized committee, are a contribution to such candidate ("coordinated expenditure contributions").

c. Under the Election Act, an "independent expenditure only committee" may raise unlimited amounts of money from individuals and from various sources that are prohibited from contributing to a federal candidate's authorized committee, and may independently spend unlimited amounts of money to influence federal elections. However, independent expenditure only committees must remain independent, and they may not make any contributions to a federal candidate or a federal candidate's authorized committee, either directly or by coordinated expenditure contributions.

d. The Election Act limited campaign contributions to $2,500 from any one individual to any one candidate in the general elections held for the office of Member of the United States House of Representatives in each Congressional District of the Commonwealth of Virginia.

3. At all relevant times, the Federal Election Commission ("FEC") was an agency and department of the United States with jurisdiction to enforce the limits and prohibitions of the Election Act, and to receive and publicly report accurate information about the source and amount of certain contributions and expenditures to influence federal elections.

4. At all relevant times, the Federal Bureau of Investigation (FBI) was an agency and department of the United States with jurisdiction to investigate criminal violations of the Election Act.

5. Until in or about November 2012, Candidate 1 was a candidate in the general election for the office of Member of the United States House of Representatives for the Eleventh Congressional District of the Commonwealth of Virginia, in the Eastern District of Virginia, and

Candidate 1 was the nominee of his political party, running as a challenger to Candidate 2, who was the incumbent and the nominee of another political party.

6. Political Committee A was Candidate 1's authorized campaign committee.

7. From in or about September 2012 to in or about December 2012, Harber was the Campaign Manager (and General Political Consultant) for Candidate 1 and participated in the direction of all significant campaign activity of Political Committee A.

8. At all relevant times, Political Committee B was a political committee, and Harber participated in its creation and operation, including registration of Political Committee B with the FEC as making only independent expenditures to influence federal elections.

9. As an independent expenditure only committee, and as Harber well knew, Political Committee B could not legally make contributions to federal candidates or their authorized committees, directly or by coordinated expenditures, but Political Committee B could raise money in unlimited amounts from individuals and from sources otherwise prohibited from contributing to a candidate for federal office or that candidate's authorized campaign committee.

10. From in or about September 2012 to in or about November 2012, Harber, knowing his course of conduct was illegal, nonetheless made and caused $325,000.00 in coordinated expenditure contributions to Political Committee A by participating in the purchase of specific advertising by Committee B from Vendor Z, which advertising politically opposed Candidate 2 for reelection in the Eleventh Congressional District of the Commonwealth of Virginia, and thus benefitted the challenger, Candidate 1, for whom Harber was simultaneously the Campaign Manager.

11. From in or about September 2012 to in or about November 2012, Harber and his family gained financially from ongoing coordinated expenditure contributions to Political Committee A from Political Committee B in the following amounts and by the following means:

 a. In or about October 2012, Vendor Z, which provided the advertising to Political Committee B attacking Candidate 2, paid a "commission" of $9,135 to Harber from the $325,00.00 paid to Vendor Z by Political Committee B.

 b. From in or about September 2012 to in or about December 2012, all of the expenditures of Political Committee B were funded by contributors to Political Committee B, and by no other source, and Harber participated in directing the Operations of Political Committee B to secure ongoing contributions to Political Committee B, and to direct approximately 23% of the total contributions to the personal benefit of himself and his family:

  (i). From in or about September 2012 to in or about December 2012, Harber and his spouse solicited and caused the solicitation of contributions to Political Committee B by, among other things, publicly and falsely representing and promising that only 2% of contributions to Political Committee B would be used for administrative costs, and that the balance of contributions would be used to assist federal candidates.

  (ii). Prior to in or about October 2012, Contributor 1 had made the maximum legal contribution to Political Committee A when Harber, as Campaign Manager for Candidate 1, directed Contributor 1 to Political Committee B to contribute more money, and, in or about October 2012, Contributor 1 became the

4

single largest contributor to Political Committee B by transferring a total of $300,000 to Political Committee B.

(iii). From in or about September 2012 to in or about December 2012, Harber and his spouse submitted invoices to Political Committee B that falsely claimed that Company A, owned by his mother, had performed specific services for Political Committee B, which services Company A never performed, thereby causing payments to Company A netting $138,000 (approximately 23% of all contributions to Political Committee B), of which his mother personally used $20,000 as a down payment for real estate, and of which his mother also transferred $118,000 to Company B, controlled by Tyler Harber, which Harber then transferred to the personal use of himself and his spouse.

12. From in or about September 2012 to in or about May 2014, Harber and his family concealed the coordinated expenditure contributions from Political Committee B to Political Committee A, and the financial benefits to Harber and his family from that coordination, by various methods:

a. From in or about September 2012 to in or about December 2012, Harber, knowing his course of conduct was illegal, caused false reports to the FEC by Political Committee A by causing the omission from those reports of coordinated expenditure contributions of Political Committee B.

b. From in or about September 2012 to in or about December 2012, Harber and his spouse, knowing their course of conduct was illegal, caused false reports to the

FEC by Political Committee B by concealing on those reports the true uses of expenditures of Political Committee B by Harber, his spouse, and his mother.

c. From in or about September 2012 to in or about December 2012, Harber used an online alias, obtained an alias telephone number, and, assisted by his spouse, changed the address of Political Committee B, all to avoid inquiries about Political Committee B's expenditures by an official of Candidate 1's party, which official Harber, using an alias, threatened with legal action if that official continued to inquire.

d. On or about September 17, 2013, at Harber's residence in Alexandria, Virginia, two Special Agents of the Federal Bureau of Investigation interviewed Harber pursuant to their assignment to investigate the facts described above as potential criminal offenses within the FBI's jurisdiction; Harber lied to those FBI Special Agents about material issues in their investigation by stating : (i) that he met Candidate 1 only once, when in truth and in fact, he met with Candidate 1 regularly as Candidate 1's Campaign Manager; (ii) that he did not do any active campaigning for Candidate 1, when in truth and in fact, he actively managed all significant aspects of Candidate 1's campaign as the Campaign Manager; (iii) that Political Committee B was not set up by him, when in truth and in fact, he directly participated in the creation and operation of Political Committee B; and (iv) that his only understanding of Political Committee B was what he saw in public sources such as FEC filings, when in truth and in fact, he fully understood and participated in directing both the public and the non-public operations of Political Committee B, including coordinated expenditure contributions by Political Committee B.

e. Following its interview of Harber on or about September 17, 2013, the FBI thereafter conducted significant further investigation revealing to the extent to which his statements were false.

f. On or about May 30, 2014, in Fort Meyers Florida, a Special Agent of the Federal Bureau of Investigation interviewed Harber's mother pursuant to the Special Agent's assignment to investigate the facts described above as potential criminal offenses within the FBI's jurisdiction; understanding that the Special Agent would communicate her statements to a Grand Jury empanelled within the Eastern District of Virginia, Harber's mother lied to the FBI Special Agent about material issues in his investigation by stating (i) that her participation in the receipt by Company A of money from Political Committee B, and her transfers of money from Company A to herself and Company B, were a clerical job for Political Committee B, when in truth and in fact those transfers were simply a means to obtain the money of Political Committee B in exchange for no services beyond the transfers themselves, and (ii) that she received $5,000 for performing her purported job, when in truth and in fact she received $20,000 for making the transfers.

13. The acts Harber took in furtherance of the offenses charged in this case, including the acts described above, were done willfully and knowingly with the specific intent to violate the law. Harber acknowledges that the foregoing statement of facts does not describe all

of his conduct relating to the offenses charged in this case.

Respectfully Submitted,

Dana J. Boente
United States Attorney

Jack Smith
Chief, Public Integrity Section
Criminal Division
United States Department of Justice

By: _____ 7/15/2014   By: _____
Mark D. Lytle                              Richard C. Pilger
Assistant United States Attorney           Director, Election Crimes Branch
                                           Public Integrity Section, Criminal Division
                                           United States Department of Justice

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, Tyler Eugene Harber, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
Tyler Eugene Harber
Defendant

I am Tyler Eugene Harber's attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____
Kory A. Langhofer, Esq.
Attorney for Defendant